**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RENEE WOLFE,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　　Defendant. | Civil Action No. 12-6083 (JLL)<br><br>**OPINION** |

**LINARES**, District Judge.

Before the Court is Plaintiff Renee Wolfe ("Plaintiff" or "Claimant")'s appeal seeking review of a final determination by Administrative Law Judge ("ALJ") James Andres denying her application for supplemental security income ("SSI"). The Court resolves this matter on the Parties' briefs pursuant to Local Civil Rule 9.1(f). For the reasons below, the Court affirms the final decision of the Commissioner of Social Security (the "Commissioner").

## I.  BACKGROUND

### A.  Facts and Procedural History

Plaintiff was born on February 17, 1960, and has a high school education. R. at 682.[1] She has held a series of part-time jobs over the years, including bus attendant, factory worker, and cleaner. *Id.* at 609, 682-83. She most recently worked twenty hours a week cleaning offices and bathrooms in 2007. *Id.* at 675. She has a long history of substance abuse. *Id.* at 609-10.

---

[1] "R." refers to the pages of the Administrative Record.

On March 20, 2006, Plaintiff filed an application for SSI with the Social Security Administration ("SSA"). *Id.* at 170. Plaintiff alleges that her disability began on October 31, 1995. *Id.* The SSA denied Plaintiff's application for SSI and subsequent request for rehearing. Pl. Br. at 2. In response, Plaintiff filed a request for a hearing before an ALJ with the Office of Disability Adjudication and Review (the "ODAR"). R. at 90.

On December 4, 2007, the ODAR advised Plaintiff that it had requested that the Disability Determination Services ("DDS") examine her claim. *Id.* at 89. The ODAR further advised Plaintiff that the DDS would return the case to the ODAR for a hearing if the DDS could not make a decision fully favorable to Plaintiff. *Id.* The DDS was unable to do so and, thus, returned the case to the ODAR for a hearing. *Id.* at 67. Said hearing occurred before ALJ Andres on June 4, 2008, in Newark, New Jersey. *Id.* at 640-43. ALJ Andres adjourned the hearing so that Plaintiff could obtain an attorney. *Id.* at 642. On August 4, 2008, Plaintiff appeared with counsel and testified before ALJ Andres. *Id.* at 644-70. After reviewing the facts of Plaintiff's case, on November 17, 2008, ALJ Andres issued a decision finding that Plaintiff was not disabled through the date of decision. *Id.* at 73-85.

Plaintiff sought Appeals Council review. *Id.* at 124. On June 19, 2009, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings. *Id.* The Appeals Council instructed the ALJ to:

> (1) "Obtain additional evidence concerning the claimant's impairments in order to complete the administrative record . . . . The additional evidence may include, if warranted and available, a consultative examination and medical source statements about what the claimant can still do despite the impairment;"
> (2) "Give further consideration to the claimant's maximum residual functional capacity [("RFC")] during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations . . . . In so doing, evaluate the nonexamining source opinion in accordance with the provisions of 20 CFR 416.927(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence;" and

(3) "Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . . The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole."

*Id.* at 124-25. On April 8, 2010, another hearing took place before ALJ Andres. *Id.* at 671-98.

Dr. Martin Fechner, a medical expert, and Julie Andrews, a vocational expert, testified at the

hearing. *Id.* at 671. Again, on April 23, 2010, ALJ Andres issued a decision finding that

Plaintiff was not disabled. *Id.* at 28-39. Once more, Plaintiff sought Appeals Council review.

*Id.* at 5-7. The Appeals Council denied Plaintiff's request on July 25, 2012, rendering the ALJ's

decision the final decision of the Commissioner. *Id.* As a result, Plaintiff appealed to this Court

on September 27, 2012. Compl. at 1-2. The Court has jurisdiction to review this matter pursuant

to 42 U.S.C. § 405(g).

B.    Medical Evidence for the Relevant Time Period

To understand Plaintiff's medical history, it is first necessary to understand her long

history of substance abuse since it has compounded many of her health problems. For

approximately twenty years, Plaintiff regularly used cocaine and heroin. *See* R. at 609-10.

According to Plaintiff, she used both substances on a daily basis from the age of twenty-five

until May 2005. *Id.* The record is unclear about Plaintiff's drug usage from May 2005 to April

2008. However, the record is clear that Plaintiff's cocaine usage relapsed by April 7, 2008. *Id.*

at 356. On that date, the University Hospital in Newark, New Jersey admitted Plaintiff for

hypertensive emergency and respiratory distress. *Id.* at 617. She confessed to cocaine usage on

arrival. *Id.* at 356. During the April 8, 2010 hearing before the ALJ, Plaintiff maintained that

she had not used cocaine or heroin since April 7, 2008. *Id.* at 683. Plaintiff claims that she is

disabled because of her health problems, which include (1) hypertension, (2) peripheral vascular

disease, (3) heart disease, (3) subarachnoid hemorrhage and cerebral aneurysms, (4) hepatitis C, and (5) depression. The Court will discuss each health problem in turn.

### 1. Hypertension

Plaintiff was first diagnosed with hypertension in 1995, and has since struggled with maintaining a healthy blood pressure. *See id.* at 270, 622, 634. To manage her hypertension, Plaintiff has taken medications including Amlodipine, Clonidine, Micardis, Hydrochlorothiazide, and Verapamil. *See id.* at 270, 451, 615. Plaintiff claims that the Clonidine makes her very drowsy. *Id.* at 667-68. According to Dr. Fechner, Plaintiff's cocaine usage was "extremely material" to her hypertension because it kept her blood pressure artificially high. *Id.* at 626.

Plaintiff contends, and the record suggests, that she has not used cocaine since April 7, 2008. *Id.* at 456, 625, 683. On that date, as previously noted, the University Hospital admitted Plaintiff for hypertensive emergency and respiratory failure. *Id.* at 617. Upon admission, Plaintiff had very high blood pressure levels and acknowledged that she had used cocaine. *Id.* at 356. When the University Hospital discharged Plaintiff on April 12, 2008, "her blood pressure was well controlled." *Id.* at 618. Likewise, on July 2, 2008, Dr. Meredith Shane, a physician at the University Hospital, noted that Plaintiff's blood pressure was "improving" with her use of Amlodipine. *Id.* at 615. One week later, however, Dr. Apostolos Voudouris noted in his Medical Source Statement of Ability to do Work-Related Activities that Plaintiff then had "uncontrolled blood pressure sometimes requiring multiple medications." *Id.* at 621-23. In March 2009, State medical consultant Dr. John M. Augustin recorded Plaintiff's blood pressure as 120/70 mm HG. *Id.* at 451. The optimal blood pressure with respect to cardiovascular risk for adults ages eighteen and older is below 120/80 mm Hg. Mosby's Medical, Nursing, & Allied Health Dictionary 219-20 (6th ed.2002) (hereinafter Mosby's Dictionary).

## 2. Peripheral Vascular Disease

Peripheral vascular disease refers to "any abnormal condition that affects the blood vessels and lymphatic vessels, except those that supply the heart." *Id.* at 1319. On September 4, 2007, Dr. Michael Singh performed surgery on Plaintiff to treat her peripheral vascular disease—a right iliofemoral endarterectomy with bovine pericardial patch—at Strong Memorial Hospital in Rochester, New York. *See id.* at 604. Strong Memorial Hospital discharged Plaintiff three days later, on September 7, 2007. *Id.* Immediately after returning home from Strong Memorial Hospital, Plaintiff was readmitted with complaints of syncope and diaphoresis.[2] *Id.* Plaintiff's symptoms subsided shortly thereafter. *See id.* at 606. Nonetheless, Strong Memorial Hospital administered a battery of tests—an EKG, a CT scan of the chest, and an enzyme test—with unremarkable results. *See id.* at 606. For instance, Plaintiff's heart had a "regular rate and rhythm" and her cardiology workup was negative for dysrhythmia and myocardial ischemia.[3] *Id.* at 603-04. Plaintiff remained at Strong Memorial Hospital for forty-eight hours and was discharged in stable condition on September 9, 2007. *Id.* at 606.

One month later, Dr. Singh described Plaintiff's post-procedure course as "unremarkable" and concluded that Plaintiff's syncopal episode "likely was associated with [Plaintiff] taking her oral analgesics on an empty stomach and then walking from her car to [a] parking lot." *Id.* at 603. At that time, Dr. Singh also noted that Plaintiff's surgical incision was healing "extremely well," she had readily palpable pulses, and her arterial insufficiency symptoms were "completely resolved." *Id.* Indeed, Dr. Singh even informed Plaintiff that she could return to work in two weeks. *Id.* In October 2008, Dr. Fechner opined that this record

---

[2] Syncope is commonly known as fainting and diaphoresis is commonly known as sweating. Mosby's Dictionary 517, 1668.

[3] Dysrhythmia refers to "any disturbance or abnormality in a normal rhythmic pattern . . . ." Mosby's Dictionary 564. Myocardial ischemia refers to "a condition of insufficient blood flow to the heart muscle via the coronary arteries often resulting in chest pain . . . ." *Id.* at 1144.

suggested that Plaintiff's operation was "successful." *Id.* at 625-26. Moreover, Dr. Augustin's March 2009 examination noted that Plaintiff's peripheral pulses were "normal," and offered no evidence of peripheral vascular disease. *Id.* at 450-52.

### 3.    Heart Disease

At age eighteen, Plaintiff underwent surgery for patent ductus arteriosus.[4] *Id.* at 450. She has had heart disease since 1981, but has had no heart attacks. *Id.* at 634. When the University Hospital admitted Plaintiff on April 7, 2008, it administered an EKG that revealed a prolonged "QT" interval. *See id.* at 617-18. As a result, a pacemaker was placed in Plaintiff's chest on April 11, 2008. *Id.* at 618. The University Hospital described this procedure as a success and her condition on discharge as stable. *Id.* Dr. Fechner later reiterated this sentiment in October 2008, noting that Plaintiff's pacemaker "took care" of her cardiac arrhythmia. *Id.* at 626. He also noted that cocaine is "material" for cardiac arrhythmia. *Id.* Despite Plaintiff's heart disease, Dr. Singh described Plaintiff's heart as "regular" in October 2007. *Id.* at 603. So too did Dr. Augustin in March 2009, as a chest x-ray disclosed Plaintiff's heart size to be normal and her heart then had no murmur, split, or gallop. *Id.* at 451-52. However, Dr. Augustin noted that there was borderline prolongation of the PR interval consistent with first-degree atrioventricular block.[5] *Id.* at 452.

### 4.    Subarachnoid Hemorrhage and Cerebral Aneurysms

In 1995, doctors diagnosed Plaintiff with a cerebral aneurysm and treated her surgically at the University Hospital. *Id.* at 450. In 2005, Dr. George Edward Vates treated Plaintiff for an unruptured basilar apex and left middle cerebral aneurysm by "clipping" them at Strong

---

[4] Patent ductus arteriosus refers to "an abnormal opening between the pulmonary artery and the aorta caused by failure of the fetal ductus arteriosus to close after birth." Mosby's Dictionary 1292.
[5] Atrioventricular block refers to "a disorder of cardiac impulse transmission that reflects prolonged, intermittent, or absent conduction of impulses between the atria and ventricles." Mosby's Dictionary 156.

Memorial Hospital. *See id.* at 599, 634. In April 2006, Dr. John Thomassen, a State consultant and psychologist, noted in his psychiatric evaluation of Plaintiff that she was "likely to have a fair prognosis for the future given her fair functioning" despite her "mild" cognitive disabilities secondary to her recent aneurysms. *Id.* at 270. Also in April 2006, Dr. Harbinder Toor, a State consultant, noted in his internal medicine examination of Plaintiff that she had "off and on" headaches since 2005. *Id.* at 634. These headaches produced a "dull achy pain" that varied in frequency, and amounted to seven out of ten on a pain scale. *Id.* In October 2007, Dr. Vates described the clipping that he performed on Plaintiff as a success, noting that she continued to do well neurologically. *Id.* at 599. However, Dr. Vates also remarked that Plaintiff had persistent short-term memory problems and some cognitive impairments, "as would be expected after a subarachnoid hemorrhage many years prior." *Id.* In March 2009, Dr. Augustin noted that Plaintiff's cranial nerves, deep tendon reflexes, and vibrations were then "normal." *Id.* at 451.

5.    Hepatitis C

Plaintiff was first diagnosed with Hepatitis C sometime around September 2008. *See id.* at 446. Notably, intranasal cocaine usage is a risk factor for Hepatitis C. *See id.* For twelve weeks—from September 2008 to December 12, 2008—the Liver Center at the University Hospital treated Plaintiff's Hepatitis C with Pegasys and Ribavirin. *Id.* The Liver Center stopped said treatment due to neutropenia.[6] *Id.* at 432.

There is no evidence in the Liver Center reports suggesting that Plaintiff had any flare-ups after the Liver Center stopped treatment. *See id.* at 418, 432-33, 446-47, 491-92, 498-99. In fact, Dr. Augustin's 2009 examination noted that Plaintiff's liver was "not palpable." *Id.* at 451. Moreover, an April 15, 2009 Liver Center report stated that "despite only 12 weeks of therapy . .

---

[6] Neutropenia refers to "an abnormal decrease in the number of neutrophils in the blood." Mosby's Dictionary 1179.

. [Plaintiff] may have had enough medicine to clear the virus." *Id.* at 492. This report also noted that Plaintiff felt well at that time and had no complaints. *Id.* at 491. Similarly, Dr. Jose Rabelo stated on August 5, 2009, that liver function tests were "normal," and that there was "no evidence of hepatic encephalopathy or any stigmata of chronic liver disease." *Id.* at 524.

### 6. Depression

Plaintiff has a history of depression and has engaged in sporadic treatment. *See id.* at 277. In September 2005, Dr. Lisa Slimmer, a psychiatrist at Unity Health System, performed a psychiatric evaluation of Plaintiff. *Id.* at 276-85. According to Dr. Slimmer, Plaintiff "present[ed] with very low self worth and esteem due to [Sic] substance abuse history." *Id.* at 280. During the evaluation, Plaintiff noted that she had been depressed since age thirty but that she had not previously sought treatment. *Id.* at 277. Plaintiff also denied symptoms of depression, suicidal ideation, and psychotic symptoms. *Id.* at 284. Dr. Slimmer diagnosed Plaintiff with "symptoms of hyperactivity and inattention, which have been present all of her life, but seem to be getting worse." *Id.* These symptoms, Dr. Slimmer noted, were causing Plaintiff's life "great dysfunction." *Id.* As a result, Dr. Slimmer recommended that Plaintiff take Concerta, a stimulant medication. *Id.*

Subsequently, in April 2006, State consultant psychologist Dr. John Thomassen performed a psychiatric evaluation of Plaintiff. *Id.* at 270-73. He noted that Plaintiff was not then taking medications for psychological reasons and had never been hospitalized for psychiatric reasons. *Id.* at 270. However, Dr. Thomassen noted that Plaintiff had been receiving psychiatric counseling for eight months. Plaintiff reported to Dr. Thomassen that she was occasionally sad, and often distracted and anxious. *Id.* at 271. Plaintiff further reported occasional midnight insomnia. *Id.* Plaintiff denied excessive anger toward others, suicidal

ideations, avoidance behaviors, and hallucinations. *Id.* Dr. Thomassen noted that Plaintiff then had impaired concentration, coherent thought processes, normal speech, broad and appropriate affect, clear sensorium, intact orientation, intact recent and remote memory skills, and fair insight. *Id.* at 271-72. Dr. Thomassen estimated that Plaintiff's cognitive functioning was in the low average range and found that her judgment was "[q]uestionable as per her history of drug abuse." *Id.* at 272. Moreover, Dr. Thomassen opined that Plaintiff's "[a]llegations of psychiatric disability were not fully consistent with [his] examination findings." *Id.* He concluded that Plaintiff was "likely to have a fair prognosis for the future given her fair functioning" at the time, but that there was a risk of relapse of substance abuse. *Id.* at 273. State consultant internist Dr. Harbinder Toor also examined Plaintiff in April 2006. *Id.* at 634-37. Dr. Toor diagnosed Plaintiff with a history depression, gave her a "fair" prognosis, and opined that "she should be followed by a psychologist or a psychiatrist." *Id.* at 636-37.

In January 2009, Plaintiff sought further help to deal with her depression from the Mount Carmel Guild Behavioral Health System ("Mount Carmel"). *Id.* at 509-16. Plaintiff told the clinician at Mount Carmel that she had low energy levels and was depressed at that time. *Id.* at 509. The clinician noted that Plaintiff had an intact memory, cooperative attitude, normal speech, a depressed mood and affect, and fair judgment and insight. *Id.* at 514-15. The clinician also noted that Plaintiff had intact thought processes, no suicidal ideations, and difficulty sleeping. *Id.* The clinician concluded that Plaintiff's highest Global Assessment of Functioning ("GAF") rating over the past year was fifty.[7] *Id.* at 515.

---

[7] The GAF Scale ranges from zero to one-hundred. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) (hereinafter DSM-IV-TR). An individual's "GAF rating is within a particular decile if *either* the symptom severity or the level of functioning falls within the range." *Id.* at 32. "[I]n situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two." *Id.* at 33. "In most instances, ratings on the GAF Scale should be for the current period (*i.e.*, the level of functioning at the time of the evaluation) because ratings of current functioning will generally reflect the need for treatment or care." *Id.* A GAF rating of forty-one to fifty indicates that an

Dr. Archila, a psychiatrist at Mount Carmel, later performed a psychiatric evaluation of Plaintiff in February 2009. *Id.* at 506-08. Plaintiff told Dr. Archila that her treatment for Hepatitis C had worsened her previous sadness. *Id.* at 506. She also mentioned decreased sleep and tiredness as an aspect of her then present illness. *Id.* Dr. Archila diagnosed Plaintiff with major depressive disorder and assigned Plaintiff a GAF rating of forty-six. *Id.* at 508.

In April 2009, State mental consultant Dr. Alec Roy examined Plaintiff. *Id.* at 455-57. Plaintiff told Dr. Roy that she had difficulty sleeping and became tired "real quick." *Id.* at 455. Plaintiff also said that she felt alright, but that her concentration was "not too good." *Id.* Dr. Roy noted that Plaintiff "did not seem seriously depressed" at that time. *Id.* at 456. He also noted that Plaintiff had normal speech and thought processes, and was well oriented to time, person, and place. *Id.* Furthermore, Dr. Roy noted that Plaintiff could follow both topics of conversation and instructions, and lacked evidence of serious memory problems. *Id.* at 456-57. Dr. Roy assigned Plaintiff a GAF rating of sixty-five.[8] *Id.* at 457. He concluded that Plaintiff's problems were mainly medical, and not psychiatric. *Id.*

Likewise, State consultant Dr. Wayne Tillman performed a mental RFC assessment of Plaintiff in April 2009. *Id.* at 482-85. He determined that Plaintiff was moderately limited in six areas of mental functioning. *Id.* at 482-83. Specifically, the ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and

individual has either "[s]erious symptoms," *e.g.*, "suicidal ideation," or "serious impairment in social, occupational, or school functioning . . . ." *Id.*

[8] A GAF rating of sixty-one to seventy indicates that an individual has "[s]ome mild symptoms," *e.g.*, a "depressed mood and mild insomnia," or "some difficulty in social, occupational, or school functioning . . ., but generally function[s] pretty well, [and] has some meaningful interpersonal relationships." DSM-IV-TR at 34.

(6) respond appropriately to changes in work setting. *Id.* According to Dr. Tillman, Plaintiff was not significantly limited in the other fourteen areas of mental functioning. *Id.*

## II.   LEGAL STANDARD

### A.   The Five-Step Process for Evaluating Whether a Claimant Has a Disability

Under the Social Security Act, the SSA is authorized to pay SSI to "disabled" persons. 42 U.S.C. § 1382(a). A person is "disabled" if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A person is unable to engage in substantial gainful activity when his physical or mental impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated under the Social Security Act establish a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 416.920(a)(1). At step one, the ALJ assesses whether the claimant is currently performing substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If so, the claimant is not disabled and, thus, the process ends. *Id.* If not, the ALJ proceeds to step two and determines whether the claimant has a "severe" physical or mental impairment or combination of impairments. 20 C.F.R. § 416.920(a)(4)(ii). Absent such impairment, the claimant is not disabled. *Id.* Conversely, if the claimant has such impairment, the ALJ proceeds to step three. *Id.* At step three, the ALJ evaluates whether the claimant's severe impairment either meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(iii). If

so, the claimant is disabled. *Id.* Otherwise, the ALJ moves on to step four, which involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity [("RFC")]; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the [RFC] to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (citations omitted). The claimant is not disabled if his RFC allows him to perform his past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). However, if the claimant's RFC prevents him from doing so, the ALJ proceeds to the fifth and final step of the process. *Id.*

The claimant bears the burden of proof for steps one, two, and four. *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Neither side bears the burden of proof for step three "[b]ecause step three involves a conclusive presumption based on the listings . . . ." *Id.* at 263 n. 2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n. 5, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987)). The ALJ bears the burden of proof for the final step. *See id.* at 263. The final step requires the ALJ to "show [that] there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). In doing so, "[t]he ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled." *Id.* (citation omitted). Notably, the ALJ typically seeks the assistance of a vocational expert at this final step. *Id.* (citation omitted).

B.    The Standard of Review: "Substantial Evidence"[9]

This Court must affirm an ALJ's decision if it is supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938)). To determine whether an ALJ's decision is supported by substantial evidence, this Court must review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, this Court may not "weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted). Consequently, this Court may not set an ALJ's decision aside, "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citations omitted).

## III.    DISCUSSION

Plaintiff raises two challenges to the ALJ's April 23, 2010 decision. First, Plaintiff challenges that the ALJ committed reversible error by failing to comply with the Appeals Council's remand order. Pl. Br. at 15-22. Second, Plaintiff challenges that the ALJ erred as a matter of law by failing to make any credibility findings regarding her testimony. *Id.* at 22-24. The Court will consider each of these challenges in turn.

A.    Whether the ALJ Committed Reversible Error by Failing to Comply With the Appeals Council's Remand Order

Plaintiff challenges that the ALJ committed reversible error by failing to comply with the Appeals Council's remand order. *Id.* at 15-22. The Appeals Council's remand order instructed

---

[9] Because the regulations governing SSI—20 C.F.R. § 416.920—are identical to those covering disability insurance benefits—20 C.F.R. § 404.1520—this Court will consider case law developed under both regimes. *Rutherford v. Barnhart*, 399 F.3d 546, 551 n. 1 (3d Cir. 2005) (citation omitted).

13

the ALJ to: (1) "[o]btain additional evidence concerning the claimant's impairments in order to complete the administrative record;" (2) "[g]ive further consideration to the claimant's maximum [RFC] during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations;" and (3) "[o]btain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . . The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole." R. at 124-25. On remand, an ALJ "shall take any action that is ordered by the Appeals Council . . . ." 20 C.F.R. § 416.1477(b). An ALJ's failure to do so constitutes reversible error. *See Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (finding that an ALJ's decision complied with the Appeals Council's remand order, and, thus, declining to reverse said decision). Here, Plaintiff contends that the ALJ failed to take any of the three actions ordered by the Appeals Council. Pl. Br. at 15-22. A discussion of this contention follows.

1. Whether the ALJ Appropriately Developed the Record as Required by the Appeals Council

Plaintiff contends that the ALJ's decision must be remanded because the ALJ failed to abide by the Appeals Council's instructions "to obtain a consultative examination and medical source statement regarding what the claimant could still do despite her impairment." *Id.* at 17. Plaintiff mischaracterizes the Appeals Council's instructions. In remanding Plaintiff's case, the Appeals Council ordered the ALJ to "[o]btain additional evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 416.912-913)." R. at 125. Contrary to Plaintiff's contention, the Appeals Council did not direct the ALJ "to obtain a consultative examination and medical source statement . . . ." Pl. Br. at 17. Rather,

the Appeals Council noted that "[t]he additional evidence *may* include, if warranted and available, a consultative examination and medical source statements about what the claimant can still do despite the impairment." *Id.* at 125 (emphasis added). Thus, the decision to obtain additional consultative examinations was discretionary.

The Appeals Council's instructions were consistent with the default rule under the social security regulations. Said regulations define a consultative examination as a "physical or mental examination . . . from a treating source or another medical source . . . ." 20 C.F.R. § 416.919. The regulations give an ALJ discretion to obtain a consultative examination "when the evidence as a whole is insufficient to support a determination or decision . . . ." 20 C.F.R. § 416.919a(b). Accordingly, at issue here is whether the evidence as a whole was sufficient to support the ALJ's decision absent additional consultative examinations. Addressing this issue requires this Court to consider whether the ALJ complied with his "duty to develop a full and fair record," a duty established by the Third Circuit in *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (citation omitted). *See Ray v. Astrue*, 649 F. Supp. 2d 391, 408-10 (E. D. Pa. 2009) (addressing a similar issue and, in doing so, considering same).

Here, the ALJ issued his initial decision—the one remanded by the Appeals Council—on November 17, 2008. R. at 124. From that date until April 23, 2010—the date on which the ALJ rendered the decision that Plaintiff now challenges—the ALJ appreciably supplemented the record. The ALJ obtained records detailing Plaintiff's treatment for Hepatitis C from the Liver Center at the University Hospital, ranging from December 2008 to April 2009. *Id.* at 418, 432-33, 446-47, 487-89, 491-92. The ALJ obtained records detailing Plaintiff's treatment for depression from the Mount Carmel ranging from January to November 2009. *Id.* at 506-20. The ALJ obtained a March 2009 internal examination of Plaintiff from Dr. Augustin. *Id.* at 450-52.

The ALJ obtained an April 2009 psychiatric examination of Plaintiff from Dr. Roy. *Id.* at 455-57. The ALJ obtained an April 2009 psychiatric review and mental RFC assessment of Plaintiff from Dr. Tillman. *Id.* at 460-73, 482-85. The ALJ obtained an April 2009 physical RFC assessment of Plaintiff from Dr. Rizwan. *Id.* at 474-81. The ALJ obtained August 2009 assessments of Plaintiff from State consultants Dr. Jose Rabelo and Dr. Ira Gash. *Id.* at 524-25. And, lastly, the ALJ obtained updated testimony from Dr. Fechner during the April 23, 2010 hearing. *Id.* at 677-82. The ALJ's obtainment of these additional documents demonstrates his compliance with his duty to develop a full and fair record. As such, this Court finds that the evidence as a whole was sufficient to support the ALJ's decision. No further consultative examinations were necessary.

2.    Whether the ALJ Explained the Weight Given to the Opinions of Nonexamining Sources as Required by the Appeals Council

Plaintiff next contends that the ALJ failed to comply with the Appeals Council's directive to explain the weight given to the opinions of nonexamining sources. *See* Pl. Br. at 17-18. Specifically, Plaintiff maintains that the ALJ "failed to acknowledge the State Agency's Physical [RFC] Assessment," *i.e.*, the opinion of Dr. Rizwan. Pl. Br. at 17. The Appeals Council instructed the ALJ on remand to:

> Give further consideration to the claimant's maximum [RFC] during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the nonexamining source opinion in accordance with the provisions of 20 CFR 416.927(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence.

R. at 125. To grasp the meaning of the Appeals Council's instructions, it is first necessary to review the regulations and rulings cited by the Appeals Council. It is also necessary to review relevant precedents.

16

Section 416.927 of Title 20 of the Code of Federal Regulations provides directions on how to evaluate "medical opinions." "Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). They include the opinions of nonexamining sources such as State medical or psychological consultants. *See* 20 C.F.R. § 416.927(e).[10] Although an ALJ is "not bound" by the findings and opinions of State consultants, he "must consider" them. 20 C.F.R. § 416.927(e)(2)(i). In doing so, the ALJ "must explain in the decision the weight given to [their] opinions . . . as [he] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources," "[u]nless a treating source's opinion is given controlling weight . . . ." 20 C.F.R. § 416.927(e)(2)(ii). SSR 96-6p further clarifies that an ALJ "may not ignore [State consultant] opinions and must explain the weight given to these opinions in [his] decision[]." This mandate extends to a State consultant's assessment of a claimant's RFC:

> Although the [ALJ is] responsible for assessing an individual's RFC . . . , the [ALJ] must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant . . . . At the [ALJ level, such assessments] are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s).

SSR 96-6p. Similarly, SSR 96-8p states that the ALJ's "RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."

---

[10] 20 C.F.R. § 416.927(f) was redesignated as subsection(e) by 77 F.R. 10657.

The language of the regulations and rulings discussed in the preceding paragraph is rigid. A number of Courts of Appeals, however, have tempered this rigidity. For example, the Tenth Circuit was willing to discount "minor undiscussed discrepancies when . . . the ALJ expressly indicated that all evidence had been considered." *Scull v. Apfel*, 221 F.3d 1352 *2 (10th Cir. 2000). The Tenth Circuit also excused an ALJ's failure to comply with SSR 96-6p's command that an ALJ "must explain the weight given to [State consultant] opinions in [his] decision" when such failure was harmless. *McAnally v. Astrue*, 241 Fed. App'x 515, 519 (10th Cir. 2007). The Seventh Circuit has similarly qualified the regulations: "Of course the regulations do not literally say that ALJs must explicitly mention every doctor's name and every detail in their reports. However, when there is reason to believe that an ALJ ignored important evidence—as when an ALJ fails to discuss material, conflicting evidence—error exists." *Walters v. Astrue*, 444 Fed. App'x 913, 917 (7th Cir. 2011) (citation omitted). Likewise, the Sixth Circuit has found that the seemingly absolute language of SSR 96-6p was satisfied by an ALJ's "brief and unspecific" statement that he had considered the opinions of State consultants. *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 664 (6th Cir. 2004).

The Third Circuit has established more general limits to an ALJ's duty to consider medical evidence. The Third Circuit has held that an ALJ is obligated to consider and explain all pertinent, relevant, and probative evidence. *See Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008) ("The ALJ was entitled to overlook [medical evidence] because it was neither pertinent, relevant nor probative.") This need is "particularly acute" if such evidence conflicts with other probative evidence in the record. *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981). Thus, an ALJ is not obligated to cite all evidence presented by a claimant. *Johnson*, 529 F.3d at 204. In addition, the Third Circuit has opted not to require remand in instances where an ALJ's

decision not to consider medical evidence had no affect on the outcome of the case. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).

Here, State consultant Dr. Rizwan opined that Plaintiff could sit for about six hours in an eight-hour workday. R. at 475. In spite of Dr. Rizwan's physical RFC opinion, Plaintiff maintains that the ALJ found that he could sit a total of eight hours in an eight-hour workday. Pl. Br. at 17. As a consequence, Plaintiff argues that there is no support for the ALJ's finding that Plaintiff had the RFC to perform light work. Pl Br. at 17-18. Plaintiff's argument is unavailing for three reasons.

First, Plaintiff misquotes the ALJ's findings. The ALJ's decision did not find that Plaintiff could sit a total of eight hours in an eight-hour workday.[11] In finding that Plaintiff had the RFC to perform "light work," the ALJ clearly noted that the regulatory definition of "light work" includes the ability to sit six hours in an eight-hour workday. R. at 34.

Second, the ALJs failure to explicitly acknowledge Dr. Rizwan's finding that Plaintiff could sit a total of six hours in an eight-hour workday has no effect on the outcome of this case. Said finding is in perfect harmony with the ALJ's finding. There was no contradiction and, thus, no "particularly acute" need for the ALJ to discuss Dr. Rizwan's findings. *Cotter*, 642 F.2d at 706. Consequently, "a remand is not required here because it would not affect the outcome of the case." *Rutherford*, 399 F.3d at 553.

Third, the ALJ stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSR[] . . . 96-6p . . . ." R. at 34. This statement demonstrates that the ALJ was aware of his obligation to consider the opinions of State agency consultants like Dr. Rizwan. Such a statement may not always satisfy the demands of 20 C.F.R.

---

[11] Plaintiff appears to have mistaken the ALJ's finding that she had the RFC to perform light work in the April 23, 2010 decision with the ALJ's hypothetical questions to the vocational expert posed during the April 8, 2010 hearing. *See* R. at 34, 688. The Court will further discuss the ALJ's hypothetical questions below.

§ 416.927 and SSR 96-6p, but this Court finds that it does so here. *See Thacker*, 99 Fed. App'x at 664 ("Although the ALJ's discussion is brief and unspecific, we find that it meets the requirements of SSR 96-6p."). This finding is bolstered by the ALJ's discussion and citation to the opinion evidence of State agency consultant Dr. Tillman. R. at 33. The ALJ's discussion of Dr. Tillman's opinion shows that not only was the ALJ aware of his obligation to consider the opinions of State consultants, but he acted on it to some extent.

Plaintiff more generally argues that "there is no support for the ALJ's 'light work' finding." Pl. Br. at 17. In doing so, Plaintiff stresses that her "necessity to elevate her legs every day because of her leg surgery belies her ability to perform the full range of light work." *Id.* at 18. The Court disagrees since substantial evidence supports the ALJ's light work finding. For instance, the ALJ found Plaintiff's claim that she needs to raise her legs every day implausible. The ALJ stated that "[a]lthough [Plaintiff] testified . . . that she has to elevate her legs, she was in no acute distress when seen on July 22, 2008 and did not mention these complaints." R. at 35. With regards to Plaintiff's legs, the ALJ also mentioned Dr. Singh's statement that Plaintiff's September 4, 2007 surgery "completely resolved her arterial insufficiency symptoms" related to her peripheral vascular disease. *Id.* The ALJ offered other evidence in support of the light work finding by discussing the following: (1) Dr. Toor's April 2006 consultative examination wherein Plaintiff stated that she could cook, clean, care for children, do laundry, and manage her funds; (2) Dr. Vates' October 2007 report summarizing Plaintiff's history of aneurysms; (3) the University Hospital records from Plaintiff's April 7, 2008 hospitalization; (4) Dr. Augustin's "unremarkable" March 2009 consultative examination; (5) Dr. Roy's April 2009 consultative examination opining that Plaintiff's "main problems are medical, not psychiatric;" (6) the 2009 Liver Center treatment notes suggesting Plaintiff's hepatitis C was no longer a cause for concern;

(7) the 2009 Mount Carmel records concerning Plaintiff's depression; and (8) Dr. Fechner's

October 2008 interrogatories and testimony from the April 8, 2010 hearing emphasizing that

Plaintiff's cocaine use was material to some of her impairments. *Id.* at 34-36.

### 3. Whether the ALJ's Hypothetical Questions to the Vocational Expert Reflected Plaintiff's Work Capacity/Limitations

Plaintiff next contends that the ALJ's hypothetical questions to the vocational expert are

deficient as a matter of law because they failed to mention Plaintiff's consistent complaints of

fatigue and the source of her fatigue. Pl. Br. at 18-21. In doing so, Plaintiff maintains that the

ALJ also violated the Appeals Council's remand order to "complete the administrative record."

*Id.* at 21. Plaintiff's contention is inapposite.

An ALJ is not required "to submit to the vocational expert every impairment *alleged* by a

claimant." *Rutherford*, 399 F.3d at 554 (emphasis in the original). Rather, an ALJ "must

accurately convey to the vocational expert all of a claimant's *credibly established limitations* . . .

." *Id.* (citation omitted) (emphasis in the original). The Third Circuit has offered some guidance

as to what this means. First, a limitation *is* credibly established by the record if it is "medically

supported and otherwise uncontroverted in the record . . . ." *Id.* (citation omitted). Second, a

limitation *may* be credibly established by the record if it is "medically supported but [is] also

contradicted by other evidence in the record . . . ." *Id.* In such instances, "the ALJ can choose to

credit portions of the existing evidence but 'cannot reject evidence for no reason or for the wrong

reason . . . .'" *Id.* (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Third, a

limitation asserted by the claimant *may* be credibly established by the record, even if it lacks

objective medical support, if it is "related to an impairment and is consistent with the medical

record . . . ." *Id.* Lastly, a limitation asserted by the claimant is generally not credibly

established by the record "if there is conflicting evidence in the record . . . ." *Id.*

Here, there is medical evidence supporting the proposition that Plaintiff experienced fatigue. For instance, Dr. Augustine's March 2009 consultative examination disclosed occasional fatigue. R. at 451. In addition, Dr. Roy noted in his April 2009 consultative examination of Plaintiff that he suspected that Plaintiff's hepatitis C treatment caused her to feel tired. *Id.* at 456. Likewise, Dr. Rabelo noted in his August 2009 consultative examination of Plaintiff that "she takes several meds that can lead to fatigue." *Id.* at 524. Moreover, Plaintiff presented to Mount Carmel with a "low energy level." *Id.* at 509.

While the ALJ's decision did not acknowledge all of these points about Plaintiff's fatigue, it did acknowledge that Plaintiff "was seen at Mount Carmel Guild on January 5, 2009 with complaints of depression, *low energy level*, poor sleep, and problems with concentration." R. at 36 (emphasis added). Thus, it cannot be said that the ALJ entirely ignored Plaintiff's fatigue. The ALJ's decision also qualified Plaintiff's complaints of fatigue, albeit indirectly. For instance, the ALJ noted that Plaintiff later stated in April 2009 that she felt "alright" during Dr. Roy's consultative examination. *Id.* Additionally, the ALJ noted that "Dr. Fechner testified that the new evidence does not change his opinion in the written interrogatories that the claimant could perform light work . . . ." *Id.* at 36, 677-78. This new evidence included Plaintiff's complaints of fatigue. The Third Circuit has cautioned that "[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations." *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002). Plaintiff has neither argued nor demonstrated that Plaintiff's fatigue amounted to a serious functional limitation. Accordingly, the fact that the ALJ's hypotheticals to the vocational expert did not reference Plaintiff's fatigue does not warrant remand.

B.     Whether the ALJ Erred as a Matter of Law by Failing to Make Any Credibility Findings Regarding Plaintiff's Testimony

Plaintiff challenges that the ALJ's failure to make any credibility findings regarding Plaintiff's testimony necessitates remand. Pl. Br. at 22-24. The crux of Plaintiff's challenge is that the ALJ "relied on blanket language to support his credibility finding." *Id.* at 23. Specifically, the ALJ's statement that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Pl. Br. at 23; R. at 34. What Plaintiff ignores, however, is that the ALJ provided a thorough discussion of Plaintiff's impairments and subjective statements about her symptoms immediately after this "blanket language." R. at 34-36. In the final paragraph of part III. A. 2. of this Opinion, the Court listed some of the evidence mentioned by the ALJ in said discussion. Thus, Plaintiff's challenge fails as it is inappropriate to read this "blanket language" in isolation—it is, in essence, an introduction. Ultimately, the ALJ complied with his duty to "review all of the pertinent medical evidence . . . ." *Burnett*, 220 F.3d at 121.

## IV.  CONCLUSION

The Court has reviewed the entire record and, for the reasons discussed above, finds that the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence. An appropriate order accompanies this opinion.

DATED: September 20, 2013

JOSE L. LINARES
U.S. DISTRICT JUDGE

23